UNITED STATES of America,

v.

Peter JAKAKAS, Defendant.

No. 76 CR 531.

United States District Court,
E. D. New York.

Dec. 10, 1976.

David G. Trager, U. S. Atty., E.D.N.Y., by Lee A. Adlerstein, Asst. U. S. Atty., Brooklyn, N. Y., for the U. S.

Marion Seltzer, Legal Aid Society, Brooklyn, N. Y., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant has moved to suppress a statement made by him on April 5, 1976, to agents of the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department. On October 26 and 27 a hearing was held on such motion and, since such date, counsel for both parties have submitted briefs in support thereof and in opposition thereto.

In the early morning of April 5, 1976, Special Agents MacDonald, Cocher and Gonziosa apparently established a surveillance on the residence of Mr. and Mrs. (Peter and Valerie) Jakakas and when Mrs. Jakakas left the residence Agents MacDonald and Cocher apparently followed her in a government vehicle.

At the same time other agents were in the process of obtaining warrants for the arrest of Mr. and Mrs. Jakakas from a Magistrate in this Court and upon obtaining the same at approximately 11:20 in the morning, they verbally notified Agents MacDonald and Cocher that an arrest warrant was outstanding for them. Immediately thereafter the agents stopped Mrs. Jakakas, advised her that they had a warrant for her arrest, searched and handcuffed her and placed her under arrest.

Thereafter they "got a message" (Tr. p. 124), went to Avenue N and saw Mr. Jakakas crossing the street. They stopped him, advised him they had a warrant for his arrest, searched him, handcuffed him and read him his rights.

Mr. Jakakas saw his wife being held in custody in Agent MacDonald's car and made what later appears to have been the first of several attempts to get to her but was denied this opportunity. Instead he was kicked face down onto the floor of the back seat of another car and transported in that posture to the offices of the agents located in the Cadman Plaza General Post Office Building in Brooklyn. Although Agent MacDonald made the arrest, searched Mr. Jakakas, handcuffed him, took him to another car and allegedly read him his rights "before placing him in the car" (Tr. 125), he claimed not to "remember if I physically put him in * * * the car" (Tr. 126), from which the Court can only infer that the Federal agent may have been ashamed to admit that the aforesaid treatment of a suspect (i. e., kicking him face down onto the floor) was used in a case such as this where an arrest was made of a person not currently in the process of committing any offense.

The second of the two arrests, namely that of Mr. Jakakas, concededly took place about 11:30 A.M. Thereafter, both of the arrestees were transported, as indicated, in separate cars to the Downtown Brooklyn Federal Post Office where they arrived at about 12:30 (Tr. 129). They were allegedly taken there, rather than to the U.S. Magistrates in this Court one block away, for "processing".

Notwithstanding the fact that the United States Attorney called "about the time that we all arrived" (Tr. 162) and directed that the agents "get him over here for arraignment" (Tr. 162) and that it took at most 40 minutes to an hour to "process" an arrestee, Mr. and Mrs. Jakakas were not taken to nor arraigned before a Magistrate until after 5:00 o'clock.[1]

1. The "processing" which allegedly took 40 minutes to an hour consisted of taking the arrestees' fingerprints and answers to a personal history questionnaire consisting of "name, address, sex, height, weight, associates, relatives, friends, occupation, education" (Tr. 154).

When Mr. and Mrs. Jakakas arrived at the agents' offices, they were put in separate rooms. Special Agent MacDonald admitted that when Mrs. Jakakas was first advised of her rights "she said she didn't want to talk" (Tr. 174) and in her case the Special Agents, at least for a time, obeyed the Miranda Rules and did not attempt to question her further.

Mrs. Jakakas (as the agents undoubtedly learned during their so-called "processing" if they did not already know) was a high school graduate who had completed two years of college and was employed as a bank teller by the Central State Bank on Court Street. Mr. Jakakas on the other hand as the agents learned when they attempted to advise him of his rights when he was first brought into their offices, was an illiterate (Tr. 131). Mr. Jakakas testified that he repeatedly asked for the assistance of his wife during the questioning and Agent Pribal confirmed this stating that throughout the whole time that (Agent Pribal) was with [Mr. Jakakas] (Tr. 242) during the course of the processing, Mr. Jakakas "was still asking for his wife" (Tr. 242). Notwithstanding such repeated requests which concededly were made, the illiterate Mr. Jakakas was given his wife's counsel on only three occasions during the four and a half hour period of "processing".

Just prior to one of these occasions, Agent MacDonald testified that he read for a second time Mr. Jakakas rights to him and that Mr. Jakakas then "signed the waiver of rights" (Tr. 130). When the Court asked for the production of such signed waiver Mr. MacDonald stated "it's on its way over" but the fact is that the waiver never was produced. (Tr. 130)

Mr. Jakakas was then shown the arrest warrant and the affidavit upon which it was based and when he advised Agent Mac-Donald he couldn't read he was told that it would be read to him. Mr. Jakakas said, however, that he wouldn't trust anybody to read it to him except for his wife at which point his wife was produced and allegedly read the two documents to him and the statute which was alleged to have been violated.

According to Agent MacDonald at this point he asked Mr. Jakakas a few questions and Mr. Jakakas declined to answer any of them. Specifically Mr. MacDonald testified that he asked him if he wanted to go into the details of the case and Mr. Jakakas said "no" and then Mr. MacDonald said "fine" and they talked about something else. And then he (MacDonald) turned his attention to something else and was not paying attention (Tr. 139).

Mrs. Jakakas testified that she first asked for permission to talk to her husband when he was being arrested and she was seated in Special Agent MacDonald's car. Mr. MacDonald's reply was that "you have no right to talk to him. It will make it harder for him" (Tr. 61). When she was called in to read the aforementioned papers to her husband and after she had done so she testified that Mr. Jakakas asked for a lawyer and she said "honey, don't say or sign anything until we see somebody", whereupon "they took me right back inside" (Tr. 65, 67). At about this point Mrs. Jakakas testified that she also asked for a lawyer (Tr. 68, 75).

The agents professed not to have heard the requests by either Mr. or Mrs. Jakakas for a lawyer but they admitted that Mr. Jakakas, after being given his Miranda warnings, and after his wife had read the charges against him, refused to answer any questions.

Following this refusal to answer questions, "then there came a time" [2] (Tr. 135), after they had tended to removing ink from

---

Assuming arguendo, the veracity of the agent's claim that the processing took such an extraordinary period of time, the government gave no explanation (other than the obvious one) as to why Mr. and Mrs. Jakakas were not taken at the end of an hour and a half (or at the end of two hours if time is allowed for Mr. Baker's processing), i. e., at approximately 2 or 2:30 P.M., before a Magistrate for arraignment.

2. Variously estimated by Special Agent Mac-Donald on cross-examination to be one to three minutes later.

his fingers and he (Mr. Jakakas) talked about something else, that Mr. Jakakas got Special Agent MacDonald's attention and said that he would select those questions put to him by Mr. MacDonald which he would choose to answer.

Between such refusal to answer and the resumption of questioning, it is conceded that no fresh or new Miranda warnings were given.

The questioning continued for some substantial period of time with no admissions apparently being made by Mr. Jakakas. Later in the afternoon, however, the agents apparently were successful in obtaining a confession from a co-suspect by the name of Dennis Baker whereupon they took Mr. Jakakas into a separate room in which Mr. Baker was being interrogated and confronted him with Mr. Baker's statement that "he was telling the entire story" (Tr. 140).

At this point Mr. Jakakas said that he felt ill. He was taken to the bathroom and when he was feeling better the agents continued their interrogation, again without first giving Mr. Jakakas fresh or new Miranda warnings, and obtained from him a "statement". At no point during this period was Mrs. Jakakas present. Thereafter "after the statement was made up, I (MacDonald) read it to him * * * asked him if he understood it. He said that he had and I said would you care to sign it?" to which he replied in the affirmative (Tr. 141). At the outset of the statement, the agent inserted "a statement of rights" (Tr. 142) and concededly this was the first new Miranda warnings that were given to Mr. Jakakas following his initial refusal to answer questions and, as indicated, the same was not given to him until after he had verbally made a statement to the agents and just before he signed the written version thereof. Again, although the agents knew or at least should have known by this time that Mr. Jakakas was illiterate, they insisted upon keeping him separate from his literate and obviously knowledgeable wife during the entire taking of the statement, the reduction of the same to writing, and the execution thereof.

Mr. Jakakas testified that during the course of the interrogation and before the confrontation with Mr. Baker the agent had repeatedly told him that if he didn't sign the confession "my wife and I would go to jail that night" and "it's not very nice she may be sexually assaulted" (Tr. 10). If that were the only testimony on the subject the Court might be persuaded to discredit it. However, Mrs. Jakakas, whose testimony (far from being inherently "incredible" as the government argues) was for the most part credible and corroborated by the testimony of the agents, said

> "They were constantly saying, the Magistrate leaves at 4 o'clock, it's 3 o'clock, if you don't cooperate you will go to jail and you'll see him tomorrow, but your wife will spend the night in jail and whatever will happen to her will happen to her, and whatever abuses she'll go through she'll go through." (Tr. 73, 74).

In any event, armed with the "confession" of the defendant Peter Jakakas, the agents proceeded with the arrestees to the Federal Building next door. According to the agents they went to the U.S. Attorneys office;[3] according to Mrs. Jakakas they went to the Magistrate. What followed is in dispute; but one thing emerges as undisputed and that is that Mrs. Jakakas, who had exercised her *Miranda* rights, was no longer accorded the right to remain silent. The agents proceeded to interrogate her in order to obtain access to her father's business premises where they believed certain offending material was stored. They persuaded her to telephone the custodian and make the premises available to their fellow

---

**3.** The "pre-arraignment interview" procedure followed by the United States Attorneys Offices for the Southern and Eastern Districts of New York has been sharply criticized by the Second Circuit. *U. S. v. Thomas Duvall and Henry Jones*, 537 F.2d 15 (2d Cir. 1976). Although Mr. Jakakas' statement was given prior to the time that the agents allege they brought Mr. and Mrs. Jakakas to the U. S. Attorney's Office, the Court considers this but another indication of a lack of concern for the defendant's rights exhibited by the agents throughout the pre-arraignment period.

agents. An inspection was made and no offending material was found. Thereafter, Mr. and Mrs. Jakakas were arraigned and released around 6:00 o'clock in the evening.

The defendant argues that the totality of circumstances outlined above clearly shows that the defendant's "statement" or "confession" was not voluntarily made. Specifically, defendant points to his claims (i) that he was arrested, handcuffed and kicked face down onto the rear floor of a car and transported separately to the agents headquarters; (ii) that when he arrived and while he was there he repeatedly told the agents that he was illiterate and asked for but was denied the assistance and counsel of his wife who was a competent and well-educated person; (iii) that both he and his wife asked for and were denied the benefit of a lawyer; (iv) that he and his wife were held for "processing" for a period of four to four and a half hours when such processing took no more than two to two and a half hours; (v) that on being advised of his rights he refused to answer any questions and that shortly thereafter, without any new or fresh *Miranda* warnings, the government agents renewed their interrogation of him, and (vi) that he was threatened by the agents with the possibility that they would allow the Magistrate to go home for the day and detain Mrs. Jakakas and himself in the Federal jail for the night where she would be sexually assaulted.

The only government agent (MacDonald) called with respect to the first of such facts claims not to "remember" the facts and no other agents (there were a number present at the scene) were called to rebut it, leaving the Court with no real alternative but to accept the same as true.

As to the second fact, Agent MacDonald refused to credit the defendant's claim that he was illiterate even after a psychologist confirmed the fact under oath at the hearing which again leaves the Court little choice in the matter, the balance of this statement being essentially unrefuted or conceded.

With respect to Mr. and Mrs. Jakakas' requests for a lawyer, the agents who testi-

fied (and not all who were present were called) said they did not hear any such request. This testimony, however, was given by Mrs. Jakakas and, while Agents MacDonald and Pribal may not have heard the request, the Court has doubts that none of the requests were made to one or more other agents.

The fourth and fifth facts were not disputed except that the government maintains as to the fifth that the defendant voluntarily solicited the renewed interrogation. However, the government called only one of the agents who was present during the questioning of Mr. Jakakas. Although the witness, Agent MacDonald, testified that *he* had not asked Mr. Jakakas any more questions after the defendant refused to answer, the witness was not asked whether or not other agents had done so. Thus, the Court is in large part left with the testimony of Mr. Jakakas that the government agents never ceased interrogating him at any time.

Finally, as indicated, the Court is troubled about the government's denial of the sixth fact particularly because of the unaccounted for two-hour delay in bringing Mr. and Mrs. Jakakas before a Magistrate for arraignment.

■ The government has a "heavy burden" of proving that the defendant's statement was voluntarily given and made. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ In view of the foregoing totality of the circumstances, the government, in the Court's opinion, has not sustained such burden.

■ Moreover, the courts have consistently held that, prior to the resumption of questioning of a person who has invoked his right not to answer questions or to remain silent, fresh or new *Miranda* warnings must be given. *Michigan v. Mosley*, 423 U.S. 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *U. S. v. Collins*, 462 F.2d 792 at pp. 801–802 (2d Cir. *en banc*); *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); *U. S. v.*

*Clayton*, 407 F.Supp. 204 (E.D.Wis.1976). As the Court said in *Collins* (at p. 802):

". . . we are agreed that what *Miranda* requires is that 'interrogation must cease' until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind."

No such fresh or new warnings were given here after the defendant invoked his rights and before questioning resumed or subsequently before an oral statement or confession was taken. This fact alone would seem under the authorities to be dispositive of the matter.

Furthermore, *Michigan v. Mosley*, *supra*, also seems to hold that a substantial period of time must elapse between an invocation of rights and a resumption of questioning and also possibly that the second interrogation be restricted to a crime that had not been a subject of the earlier interrogation. In *Mosley*, there was a lapse of two hours before questioning was resumed. In this case the lapse of time was variously estimated to be from one to three minutes, which can scarcely be said to be substantial, and of course the questioning was not restricted to another crime.

In addition, the courts have held that if an arrestee under interrogation at any time asks for a lawyer, all questioning must forthwith cease and may not be resumed until the arrestee's lawyer appears or, if the arrestee has no lawyer, until one is furnished. *Miranda v. Arizona, supra*, at 444–445, 86 S.Ct. 1602; *United States v. Crisp*, 435 F.2d 354 (7th Cir. 1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971).

It should be noted in passing that while a four and a half to five hour delay in bringing an arrestee before a Magistrate may not be sufficient to infer that a confession was involuntary, *United States v. Barrera*, 486 F.2d 333 (2d Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974); *U. S. v. Ortega*, 471 F.2d 1350 (2d Cir. 1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *U. S. v.*

*Marrero*, 450 F.2d 373 (2d Cir. 1971), *cert. denied*, 405 U.S. 933, 96 S.Ct. 120, 46 L.Ed.2d 90 (1972), this fact coupled with threats of overnight incarceration might well be deemed sufficient for the purpose of drawing such an inference, *cf., U. S. v. Olof*, 527 F.2d 752 (9th Cir. 1975). However, this is a point which we need not now decide.

Finally, while the Court has been furnished with, and has found, no case directly on point, the denial, without good cause, of the requested assistance of a literate wife (being held in the next room) to an illiterate husband under interrogation strikes this Court as not only unreasonable but unconscionable, *cf., Cobbs v. Robinson*, 528 F.2d 1331 (2d Cir. 1975), *cert. denied*, 424 U.S. 947, 96 S.Ct. 1419, 47 L.Ed.2d 354 (1976); *People v. Townsend*, 33 N.Y.2d 37, 347 N.Y.S.2d 1187, 300 N.E.2d 722 (1973).

This Court is aware of the fact that the *Miranda* case and its progeny have come under increasing attack and that many of the principles therein established may well (and perhaps should) be modified. (*See, e. g., Brewer v. Williams*, No. 74–1263 (45 U.S.L.W. 3270 (October 12, 1976)). Nonetheless, the Court is very much troubled by the total picture presented in this case and, while it has doubt about whether there was "coercion" in the ordinary sense of the word, under the stringent legal tests which are required to be used to determine whether a statement is voluntary, this Court may not hold that the government has sustained its heavy burden of proof.

For the foregoing reasons, defendant's motion to suppress must be and the same hereby is granted.

SO ORDERED.