Tommy McDougle appeals from a conviction of murder and life sentence by the Circuit Court of Nashoba County.
On September 4, 1976, Theodore Lyons and Tommy McDougle were playing a card game called "tunk" in a booth of the Kick-Off Club in Neshoba County. Lyons won the first two hands and McDougle the third hand. In the fourth hand the appellant dealt himself one too many cards and declared a misdeal. Lyons and McDougle both seized the two dollars upon the gaming table, engendering an argument which precipitated the fatal shots.
According to Robert Jones, an eyewitness, McDougle was standing by the booth when he threw other money on the table which was seized by Lyons who was seated in the booth. This money was in Lyons' left hand at the time McDougle fired several shots. Immediately after the shooting, Lyons arose, walked two steps and fell on his back. Jones testified he observed no weapon on the deceased.
Garland Moore, who was on the front porch when the shooting occurred, testified that the appellant exited from the front door with a gun in his hand. Moore entered the club and found the deceased lying three or four feet from the booth with money in his hand. He checked his pulse, but did not remove anything from Lyons' pocket nor see any weapon.
McDougle claimed the shooting was in self-defense. He testified they were standing face to face outside of the booth and as he turned to leave, Lyons began pulling a .25 automatic out of his front pocket. McDougle stated he pulled his gun and hesitated before firing to be certain what Lyons had. After leaving the club, he threw the gun away and later surrendered to the authorities.
The sheriff and his deputy arrested McDougle at his brother's house later that night. After arriving at the jail the sheriff read the appellant his Miranda rights from a card. When McDougle indicated he wanted to talk to the officers alone, he was escorted to the sheriff's office approximately 150 yards from the jail. Once there he stated he did not have anything to say and it is disputed whether he said he would not talk without an attorney. After being returned to his cell, the sheriff and deputy stood on the outside. According to the sheriff, he continued questioning appellant and asked him how many times he shot Lyons, to which McDougle replied that he shot him five or six times over a two dollar misunderstanding and that he thought Lyons was reaching into his pocket.
The appellant denied making any statement to the sheriff on the night he was arrested and contended he requested a lawyer before talking. However, he admitted that several days later when he and the sheriff searched for the missing gun in a field, the sheriff asked him why he did it and he replied that Lyons "was coming out of his pocket with a .25 automatic." An attorney was not appointed for the appellant until September 23, when he was indicted.
On appeal he cites among the errors of the lower court the following:
1. Admitting custodial statements of appellant after he declined to make a statement and requested an attorney;
2. Denying admission of previous inconsistent statements made by a witness; and
3. Denying introduction of evidence that the deceased had a pistol in his possession the previous day. *Page 1388 
Appellant first contends that the trial court erred in admitting into evidence the custodial statements of appellant. It is undisputed that McDougle told the interrogating officers that he did not have anything to say and that after returning him to his cell, the sheriff by his own admission, persisted in questioning him.
 BY MR. ALFORD, DEFENSE COUNSEL.
 Q. Well, now, you continued to talk to him after he told you he didn't want to talk to you, didn't you? Didn't he tell you that in the Sheriff's office?
 A. He said he didn't want to make a statement at that time.
 Q. He said that in the cell and he said that in the Sheriff's office, too, didn't he?
 A. He did.
 Q. That was twice, wasn't it?
 A. He told me that twice.
 Q. And then you took him back over there and locked him up and you heard Mr. Griffin testify here that you asked him what happened, didn't you?
 A. That's true.
 Q. Did you ask him that over there?
 A. Did I ask him what?
 Q. What Mr. Griffin said you did?
 A. What, if he shot the boy?
 Q. Asked you what happened. Did you ask him that question?
 A. I did.
 Q. And that was after he had asked you not to question him, too, wasn't it?
 A. He didn't ask me not to question him.
 Q. He told you he didn't want to make a statement, didn't he?
 A. He did when he was in the Sheriff's office.
The record does not disclose any renewal of the Miranda
warnings or any waiver by the appellant after he stated he had nothing to say.
Whether he requested an attorney before making a statement is inconclusive although possible as the sheriff on direct examination and in the presence of the jury testified that appellant said he wanted an attorney before talking any more and on cross-examination contradicted himself testifying that appellant never requested an attorney.
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), clarified the scope of custodial interrogation and stated in that regard:
 Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. . . . (384 U.S. at 473-474, 86 S.Ct. at 1627-1628, 16 L.Ed.2d at 723.)
It further provided that where the custodial interrogation proceeds without the presence of counsel and yields a statement, the government bears a heavy burden to demonstrate that the suspect's constitutional rights have been respected.
The vast majority of federal and state courts has concluded theMiranda opinion does not create a per se proscription of further interrogation once the person being questioned has expressed a desire to remain silent. Michigan v. Mosley,423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). What Miranda
apparently requires is cessation of interrogation when requested and if subsequently there is a reasonable basis for inferring that a suspect has voluntarily changed his mind, new and adequate warnings must be given. U.S. v. Collins, 462 F.2d 792 (2d Cir. 1972) (en banc); cert. den., 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); U.S. v. Jakakas, 423 F. Supp. 564 (E.D.N Y 1976). *Page 1389 
However, we are of the opinion the state did not meet its burden of proof in this case where there was no evidence or inference of the appellant's desire to make a statement but rather the interrogation continued closely on the heels of the first (less than a ten-minute lapse) despite his express desire not to make a statement. Compare U.S. v. Bensinger,463 F.2d 576 (7th Cir. 1972), and U.S. v. Barnes, 432 F.2d 89 (9th Cir. 1970). Therefore, we hold the statements of the appellant to be inadmissible and prejudicial, necessitating a new trial.
Appellant's second assignment of error is that the proffered testimony of Charles Coleman was admissible for impeachment of Willie Brown's testimony. Coleman testified out of the presence of the jury that about a month after the shooting Brown told him he saw Garland Moore and another trying to take some money from Lyons' body. However, defense counsel failed to lay the proper predicate for impeachment when Brown was previously on the stand. At that time he asked Brown if on or about the Tuesday after the shooting he told someone that he made Moore move because he thought Moore had taken a gun out of Lyons' pocket, which Brown denied. It is established law that in absence of a proper predicate being laid, a witness cannot be impeached. Scott v.State, 274 So.2d 376 (Miss. 1973); Nichols v. State, 220 Miss. 244, 70 So.2d 515 (1954). Therefore, we think this assignment of error is of no merit.
Another contention of appellant is that the lower court improperly sustained an objection to the proffered testimony of witness Roosevelt Peyton that Lyons was armed with a .22 automatic pistol in his right front pocket on the night before the shooting. Peyton testified that he and Lyons had been together the night before but did not place the defendant with them. Defense counsel maintained that the purpose of this testimony was to show that Lyons habitually carried a gun. However, one incident does not make an action habitual, although in homicide prosecutions it is permissible to demonstrate that the deceased as an aggressor had a reputation for habitually being armed and a bad reputation for peace and that the defendant knew these facts. Sprinkle v. State, 137 Miss. 731, 102 So. 844 (1925).
Further, when the defendant later testified on his own behalf, defense counsel did not develop the facts of Lyons' being previously armed. On cross-examination by the district attorney, the defendant stated that he saw the gun at Shaky Ground, but it was not clear when this occurred. Defense counsel did not pursue this questioning on redirect examination. Thus, we think that the trial court did not err in its ruling.
We are of the opinion the other assignments of error are without merit. We reverse and remand for a new trial because the admonitions of Miranda, supra, were violated.
REVERSED AND REMANDED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.