426 So.2d 786 (1983)
Roe Daniel "Pete" MURPHY
v.
STATE of Mississippi.
No. 53967.
Supreme Court of Mississippi.
February 2, 1983.
*787 Langston & Lott and Duncan Lott, Booneville, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, ROY NOBLE LEE and PRATHER, JJ.
ROY NOBLE LEE, Justice, for the Court:
Roe Daniel "Pete" Murphy was convicted in the Circuit Court of Lee County, Honorable Neal Biggers, Jr., presiding, on a charge of receiving stolen property and was sentenced to three (3) years in the custody of the Mississippi Department of Corrections. He has appealed here and assigns seven (7) errors in the trial below. We reverse.
Larry Brown, Manager of Fast Freight Systems, Inc., a truckline in Tupelo, Mississippi, drove one of the company's freight trucks home on Saturday, September 13, 1980, and left his 1973 four-wheel drive Chevrolet pickup at the place of business. The truck was locked, but when he returned to work on Monday morning, around 8:30 a.m., the vehicle was missing, and he reported the theft to the Tupelo police. The next day, Tuesday, September 16, he and a friend attempted to locate the stolen truck and drove to appellant's place of business, an automobile repair shop in the Chesterfield Community of Lee County.
Brown and his friend walked into the garage, operated by appellant, and saw the front bumper and a winch from the stolen pickup truck lying on the floor. This incident occurred at approximately 9:00 a.m. Brown left the garage and went to the sheriff's office where he reported the discovery. Detective Hall and two other officers accompanied Brown to appellant's garage for further investigation. No search warrant was obtained before going there. They arrived at the garage about 10:30 a.m. and entered same, but appellant was not present. An employee went to appellant's house, approximately seventy-five (75) yards away, and reported to him that the officers were at the garage and wanted to talk with him.
The garage building is a 40 X 60-foot metal building. The shop doors were open when the officers arrived, and the bumper and winch were still plainly visible on the floor inside the shop. When the officers inquired of appellant about the winch, he replied that he had bought it from someone else the day before, but refused to say who sold it to him. The officers then informed appellant that they were taking the winch and bumper and that appellant should come with them to the sheriff's office. Appellant had not been placed under arrest at this time, and drove his own car to the sheriff's office. After conferring with the sheriff and chief deputy, Detective Hall placed appellant under arrest when he arrived, the original charge being grand larceny of the truck. Appellant was advised of his rights, and he executed a form granting the officers permission to search his shop. He freely admitted that he understood his rights and said that he had nothing to conceal.
Officer McMullan and another officer went back to the garage to look for other missing items, which Brown had listed in the original theft report, and their search *788 turned up three of them: a Navy-type spotlight, a Cobra CB radio, and several boxes of new and reloaded shotgun shells (all found in various parts of the shop). They were tagged and photographed, and Brown identified them to be from his stolen pickup truck. Later in the afternoon, at approximately 4:00, the officers decided to question appellant further. Officers Hall and Miller were present and advised appellant of his rights, and he voluntarily signed a waiver of those rights. The officers then asked appellant to make a statement, but he refused. They testified, however, that, immediately, without any additional questions being asked, appellant, of his own volition, said that he didn't steal the truck, but that he knew who did; that the person was a friend and he did not want to cause him any trouble; that he knew the items were stolen, but that it was too good a bargain to turn down; and he suggested a good place to begin looking for the vehicle (the vehicle was found in that area later).
On the trial, appellant admitted signing the forms but denied that he went ahead and talked to the officers, and he denied saying that he knew the items were stolen and who stole them. He testified that he bought the items from a person a day or two before the police came and gave him five hundred dollars ($500.00) in cash for a machine, the winch and bumper, a box of tools and two (2) chain saws; that the spotlight, CB radio and shotgun shells were part of this deal and the man just gave him those things; that he didn't know the man's name, and had not seen him before or since; that he had no reason to believe the articles were stolen; that, if there had been something to indicate a theft, he would have hidden the items instead of leaving them out in the open.
The jury retired at 6:20 p.m. and at 8:50 p.m. the trial judge called the jury into the courtroom for a report on its progress. It retired again at 8:55 p.m., and at 9:25 p.m. returned with a verdict of guilty as charged.

I.
Did the lower court err in admitting evidence obtained during a warrantless search of appellant's property?
Appellant contends that the officers violated his constitutional rights in going upon the garage premises and that the fruits of the search and seizure should have been suppressed.
The important question in considering this assignment of error is whether or not appellant's garage was a public place. When Brown and his friend initially went to the garage, the doors were open, a mechanic was working inside, and the stolen articles were seen by them lying on the floor of the garage. Upon receiving that information, the officers went to the garage, the doors were still open, and they saw the articles lying on the floor of the garage, they talked with appellant, and then returned to the sheriff's office with the stolen articles. Appellant followed them to the office in his own car.
The evidence shows that various people went to and from the shop for the purpose of doing business with appellant and, we hold that it was a public place. In Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967), the Court said: "What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection."
In United States v. Various Gambling Devices, 478 F.2d 1194, 1200 (5th Cir.1973), the Court said:
The federal courts have consistently held that a law enforcement officer may enter commercial premises open to the public and observe what is in plain view. See Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).
See also Campbell v. State, 278 So.2d 420 (Miss. 1973).
We are of the opinion that the garage, being a public place, did not require a search warrant when Brown, his friend and *789 the officers went to the place and saw the stolen articles on the floor, and that the officers had probable cause to arrest appellant. No further search was conducted at that time. After permission to search was voluntarily granted by appellant, the officers went back to the premises and conducted a thorough search which was not in violation of appellant's constitutional rights. Therefore, the lower court properly admitted the evidence obtained from appellant's garage.

II.
Did the lower court err in allowing testimony concerning appellant's confession since it was the result of an illegal arrest and was given after appellant had exercised his right to remain silent?
Appellant argues here that the statement made by him should not have been admitted because it was obtained after an illegal arrest. We have held that the officers had probable cause to arrest appellant, that the search of the premises was proper, and that the evidence obtained was admissible. Much of that discussion is applicable to the assignment here. In Jones v. State, 358 So.2d 414, 416 (Miss. 1978), the elements stated by the Court follow:
Two elements are necessary to establish probable cause in order to arrest an individual without a warrant: (1) determination that a felony has been committed, and (2) reasonable grounds to suspect and believe the person proposed to be arrested committed the felony. McCollum v. State, 197 So.2d 252 (Miss. 1967); Clanton v. State, 242 Miss. 734, 137 So.2d 180 (1962).
Appellant contends that the testimony relating to his confession should have been suppressed because the statements were made after he had signed a form indicating his desire to remain silent. As mentioned hereinabove, when appellant was read the Miranda warnings, according to the officers, he, immediately, without any questioning from the officers, began to make a statement of his own volition. The statement was incriminating. Under the facts of this case, appellant waived his right to remain silent and it was not necessary for the officers to stop or interrupt appellant and give him the Miranda warnings a second time. Even when the officers asked questions, the answers were in response to the voluntary statement that was being made by the appellant. In McDougle v. State, 355 So.2d 1386 (Miss. 1978), the Court cited Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as follows:

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), clarified the scope of custodial interrogation and stated in that regard:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked... . (384 U.S. at 473-474, 86 S.Ct. at 1627-1628, 16 L.Ed.2d at 723.) (Emphasis added)
355 So.2d at 1388.
The McDougle Court went on to state:
The vast majority of federal and state courts has concluded the Miranda opinion does not create a per se proscription of further interrogation once the person being questioned has expressed a desire to remain silent. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). What Miranda apparently requires is cessation of interrogation when requested and if subsequently there is a reasonable basis for inferring that a suspect has voluntarily changed his mind, new and adequate warnings must be given. U.S. v. Collins, 462 F.2d 792 (2d *790 Cir.1972) (en banc); cert. den., 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); U.S. v. Jakakas, 423 F. Supp. 564 (E.D.N.Y. 1976). [355 So.2d at 1388].
In United States v. Hopkins, 433 F.2d 1041 (5th Cir.1970), addressing a similar question, the Fifth Circuit Court of Appeals stated:
There is no evidence that Hanley persisted in interrogating Hopkins despite his refusal to waive his constitutional rights. Nor is there evidence that Hopkins manifested inconsistent conduct because of confusion. See United States v. Nielsen, 7 Cir. 1968, 392 F.2d 849. Rather, the record shows that Hopkins, after refusing to waive his rights and upon seeing Hanley get up to leave, initiated the ensuing conversation in order to exculpate himself. The ensuing questions asked by Hanley were simply designed to pursue the line of inquiry begun by Hopkins. This case then resembles those instances where the accused voluntarily confesses prior to questioning. United States v. Welsh, 5 Cir.1969, 417 F.2d 361; Stone v. United States, 10 Cir.1967, 385 F.2d 713; Lamb v. Peyton, W.D.Va. 1967, 273 F. Supp. 242. (Emphasis added) [433 F.2d at 1044].
See also United States v. Carpenter, 611 F.2d 113 (5th Cir.1980), cert. den. 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980); United States v. Perkins, 608 F.2d 1064 (5th Cir.1979); and United States v. Rieves, 584 F.2d 740 (5th Cir.1978).

III.
Did the lower court err in submitting an unwarranted "Allen" instruction?
After hearing the evidence, the jury retired at 6:20 p.m. and, at 8:50 p.m., the trial judge called the jury to the courtroom to obtain a report on its progress. The following exchange took place:
BY JUDGE BIGGERS: Ladies and gentlemen of the jury, I called you out to get a report from you. Have you not been able to arrive at a verdict yet?
BY JUROR: No, sir.
BY JUDGE BIGGERS: All right. What I tell you now does not change anything that I have already given you as far as instructions are concerned on what the law is and what your duties are, you certainly, as I have previously instructed you, you have a right to disagree. The issue in this case is simply a pretty simple issue, as counsel pointed out to you, both sides in their final arguments. It does not appear to be a complicated case; so, I think that you have had ample time to deliberate on this issue. I see no reason why you couldn't return a verdict in this case one way or the other. I don't think it's the kind of case that is a complicated enough case that people would have difficulty understanding it. If you don't agree, of course, we will have to keep the case on the docket and it will have to be done over again in another term of court, and be presented to another jury. But, I don't see any reason why we would ever be able to get a better jury than this one to decide the case. As you have seen from being up here this week, this is a rather expensive process that we go through to get to where we are now; and, of course, expense is not the primary consideration, the main thing we are interested in is to see that justice is done. But, considering the simple issue involved in the case, I have no reason to believe we could ever get a better jury who would be able to resolve the issue than we have got now. So, I am going to ask you to retire and let me emphasize the previous instructions that I gave you and which were to the effect that you should freely and fully deliberate with each other with the end toward reaching the verdict in the case one way or another. I have no reason to believe that you can't do that or shouldn't be able to do that. All right, I am going to retire you back to the jury room and ask you to continue your deliberations.
In Coleman v. State, 350 So.2d 55 (Miss. 1977), the lower court had the jury return to the courtroom, after a period of deliberation, and gave it an additional charge, which was similar to the statement made by *791 the lower court here. In reversing the case, the Court cited Sharplin v. State, 330 So.2d 591 (Miss. 1976), where the "Allen" charge was condemned, and the Court stated: "Following publication of this opinion, the `Allen charge' in any of its various forms should not be given." [350 So.2d at 57].
In the case sub judice, when the trial judge called the jury into the courtroom, he inquired whether the jury had been able to arrive at a verdict and then talked to it about the expense of trials, and the necessity of trying the case again, in the event the jury could not agree, and he complimented the jury on being a good jury. There was a complete departure from the procedure mandated in Sharplin v. State, supra.
Apparently, the defense attorney had no knowledge of what the trial judge intended to say, and he did all that he could do in that situation, viz, as soon as the jury returned to the jury room, he registered his objection and moved for a mistrial, which was overruled.
We are of the opinion that the statement by the trial judge was highly prejudicial, the jury having already deliberated for two (2) hours and thirty (30) minutes. Because of that error, the judgment of the lower court must be reversed and the case remanded for a new trial.
It is not necessary to address the other three assignments of error since they either are without merit or probably will not occur on retrial of the case.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.