(No. 62192.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES FOSTER, Appellant.

*Opinion filed December 21, 1987.—Rehearing denied February 2, 1988.*

74

CUNNINGHAM, J., took no part.
SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, and Karen McNaught, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

Following a jury trial in the circuit court of Kane County, the defendant was found guilty of the murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) of Jacqueline Simmons. The State asked for the death penalty, and after a hearing, the circuit court found that there existed a statutory aggravating factor in that the murder was committed in the course of an aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), and that there were no mitigating factors sufficient to preclude imposition of the death sentence. The court sentenced the defendant to death, but the sentence was stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, sec. 4(b); 107 Ill. 2d R. 603.

On January 22, 1985, the defendant was charged by indictment in the circuit court of Kane County with intentional murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), knowing murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)), and felony murder predicated upon the offense of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)).

The State's principal witness was Theresa Williams, who shared an apartment with the victim and who told

of the events leading to Simmons' death. She testified that on the evening of January 9, 1985, the defendant came to her apartment in Aurora several times looking for Simmons. The defendant seemed "upset and angry" and appeared angrier at each visit. At about 9:30 p.m., Simmons came home and the defendant appeared several minutes later with John Chapman. The defendant, Chapman and Simmons then left and drove to a liquor store where they purchased some wine, beer and gin.

When they returned to the apartment, the defendant was yelling at Simmons and she was screaming and crying. The defendant threw Simmons to the floor and began hitting and kicking her. After striking her, several times, the defendant walked to the bathroom and Simmons went into the living room, where she was joined by Chapman and Williams. The defendant came in with a baseball bat and began striking Simmons with it while she sat on the living room couch. Williams described the bat as 24 inches in length and 2 to 3 inches in diameter with the rounded stem broken off. As the defendant struck Simmons with the bat, he cursed and accused her of "messing around" on him. Williams stated that Simmons pleaded with him to stop hitting her, but the defendant continued to strike her with the bat on her legs, arms and back.

At one point the defendant ordered Simmons to take her clothes off, which she did. Williams testified that the defendant told Chapman that he needed to examine Simmons' underclothes to see if she had recently had sexual relations with another man. The defendant took Simmons to the bathroom, where, Williams testified, the defendant beat Simmons while badgering her to admit that she was having sexual relations with other men. After being beaten, Simmons admitted having had sexual relations with another man.

The defendant and Simmons went to the living room, where the defendant ordered her to put her clothes on and "go out and make him some money." He ordered Williams to help Simmons put on her clothes and to wipe the blood from her mouth. As she attempted to do so, the defendant resumed striking Simmons with the bat, Williams testified, "like you would when you are playing baseball, [with] both hands."

Williams left the living room and went into the kitchen. When she returned Simmons was lying on her stomach with her pants pulled down and the bat partly inserted in her rectum. The defendant was kneeling behind her. Williams returned to the kitchen followed by Chapman and Tony Lloyd, Theresa Williams' boyfriend, who had just arrived at the apartment. The defendant entered the kitchen several minutes later holding the handle of the bat and, according to Williams, began "bragging" about how far he had inserted the bat handle.

Williams returned to the living room and found Simmons lying on the couch breathing irregularly and appearing to be suffering a seizure. She found a spoon and gave it to the defendant who placed it under Simmons' tongue in an attempt to control the seizure. Williams told the defendant that Simmons needed to be taken to the hospital but the defendant said that Simmons was drunk and that they should let her sleep it off. The defendant and Chapman then left to visit taverns but returned about 20 minutes later. When the defendant returned, Williams told him that Simmons was dead. The defendant attempted mouth-to-mouth resuscitation, but after several minutes gave up and threw his car keys to Lloyd telling him to call the paramedics.

Anthony Lloyd also testified on behalf of the State. He stated that when he entered the victim's apartment on the evening of January 9, 1985, at about 11 p.m., the

defendant, holding a part of a broken bat in his hand, walked into the living room with Simmons. The defendant was staggering and "looked like he was high." Sitting in the kitchen with Chapman and Williams, Lloyd heard Simmons screaming and seven or eight times "some cracking sounds, like a bat hitting a ball." He testified that the defendant came into the kitchen a short time later and told Lloyd how he had inserted the bat into Simmons' rectum and indicated the depth to which he had inserted it.

Dr. Charles Conley, deputy coroner for Kane County, testified that he performed an autopsy on Jacqueline Simmons, which showed that she had suffered several blunt-trauma-type injuries to the head, chest, abdomen and legs; that the brain was swollen to a moderate degree; and that the victim's liver exhibited two lacerations which caused bleeding into the abdominal cavity. Dr. Conley also stated that he discovered a small laceration on the anus and an area of hemorrhage five inches from the anus. His opinion was that the cause of death was multiple blunt trauma, resulting in swelling of the brain and internal hemorrhage of the liver.

The State also had entered into evidence the defendant's written confession, and officers testified to the oral confession he gave at the Aurora police station following his arrest. Both confessions substantially corroborated the testimony of Williams and Lloyd.

Upon the jury's finding the defendant guilty of murder, and the entering of a judgment of conviction, the State asked for the death penalty. The court accepted the defendant's waiver of sentencing by jury, and after the first stage of the sentencing hearing, the court found that the defendant was subject to the death penalty being 18 years of age or older at the time of the murder and having had "actually killed" the victim in the course

of a felony, to wit, aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)).

At the second stage of the sentencing hearing, the State presented evidence in aggravation, which included evidence of the defendant's previous convictions for misdemeanor battery, felony robbery, theft, and illegally possessing firearms. The State also presented testimony of several witnesses who described other crimes and acts of violence the defendant had allegedly committed. In mitigation, the defendant offered the testimony of various members of his family and friends who testified to his being kind, generous and a religious person. One of these witnesses, Earline Taylor, testified that she had had two daughters by the defendant, and that he has maintained a close relationship with the girls and assisted the children financially whenever possible. At the conclusion of the hearing, the court found that there were no mitigating factors sufficient to preclude the imposition of the death penalty and sentenced the defendant to death. The cause comes before this court for direct review as our constitution provides (Ill. Const. 1970, art. VI, sec. 4(b)) and Supreme Court Rule 603 (107 Ill. 2d R. 603).

The defendant argues that his conviction should be reversed and a new trial ordered on several grounds. First, the defendant contends that the trial court erred in failing to suppress inculpatory statements he made at the Aurora police station following his arrest. The defendant states that he was arrested without probable cause and that the statements are inadmissible as "fruits" of the illegal arrest. *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Higgins* (1972), 50 Ill. 2d 221, 227.

Prior to trial, the defendant moved to quash his arrest and suppress evidence. The evidence at the hearing was that at approximately 1 a.m., on January 10, 1985,

Patrol Sergeant John Richmond and Officer Stephen Bonnie of the Aurora police department responded to a call to assist an ambulance crew at 425 Avon Street in Aurora. When they arrived the officers were met at the entrance to the second-floor apartment by the defendant, James Foster, who directed them to the living room where John Chapman, Tony Lloyd and Theresa Williams were. A black woman identified as Jacqueline Simmons was lying on her side on a couch. Her head and face were bloody and discolored and her jaw appeared to be broken. The paramedics arrived several minutes later and after unsuccessfully attempting to revive the woman, pronounced her dead at approximately 1:20 a.m.

After the ambulance left, the officers questioned the persons in the apartment. Theresa Williams, who lived with the victim, told the officers that she was home alone that evening with her children when Simmons, already severely beaten, came in about 10 p.m. She helped Simmons to the couch in the living room, where Simmons lost consciousness. The defendant told the officers that he was the victim's boyfriend and that he had arrived at the apartment 15 minutes before the police. Chapman stated that he had arrived about a minute after the defendant, and Lloyd stated that he was the last to arrive and that he was the one who had called the paramedics.

Officer Bonnie testified that while he was questioning the defendant, he appeared nervous and upset. Bonnie testified that he knew both Chapman and the defendant and that they had a reputation in the community for being violent.

Richmond and Bonnie found smudges of blood on the bathroom walls and clumps of black hair (the color of the victim's hair) on the floor. A further search of the apartment disclosed blood on the hallway and living room

walls and large clumps of hair, wood splints and a kitchen spoon lying on the floor next to the body. When asked about the hair and spoon, Williams stated that the hair had fallen out of the hood of Simmons' jacket and that "they" had used the spoon, apparently to depress her tongue, in an attempt to aid Simmons when she was having difficulty breathing.

Having searched the apartment, Bonnie went to the first-floor apartment to interview the residents, Lupe and Arturo Moreno. Lupe Moreno told Bonnie that a few hours earlier she heard a commotion in the upstairs apartment that sounded like "somebody being beaten and banged on the floor." She stated that it continued from 10 p.m. that night to approximately 1 a.m. when the officers arrived and that during this time she could hear one female and three or four male voices in the second-floor apartment. Arturo Moreno told Bonnie that when he came home at 12:30 a.m., he knocked on his apartment door, and when he did, a man emerged from the second-floor apartment, but apparently realizing it was not a caller at that apartment, went back into the apartment. The Morenos both stated that they could not recall hearing anyone enter or leave the upstairs apartment from the time the commotion began until the officers arrived. At this point, the officers took the defendant, Lloyd, Chapman and Williams to the Aurora police station for questioning.

The State maintains that the officers had probable cause to arrest the defendant for the offense of obstruction of justice when he was placed under arrest. The offense of obstruction of justice is defined in section 31—4(a) of the Criminal Code of 1961, which provides:

"A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or de-

fense of any person, he knowingly commits any of the following acts:

(a) *** furnishes false information ***." Ill. Rev. Stat. 1985, ch. 38, par. 31—4(a).

The State submits that the arresting officers had probable cause to believe that the defendant either participated in the homicide or had witnessed it, and attempted to mislead the officers by telling them that he was the victim's boyfriend, had just arrived at the apartment and did not know what had happened to the victim. The State says the officers' search of the apartment revealed evidence that indicated that the fatal beating had taken place in the apartment and that the statement of Mrs. Moreno indicated that three males and one female were in the apartment at that time. The officers also learned that the persons in the victim's apartment when the officers arrived were the same ones who were there during the beating; the Morenos had told them that they had not heard anyone leave the apartment from the time the commotion began until the officers came. The State says that the evidence showed the arresting officers that the defendant, and the others in the apartment as well, were lying to mislead the officers into believing that the victim had been beaten outside the apartment by someone unknown to them.

The defendant says that the officers did not have probable cause to believe that he was committing the offense of obstruction of justice. They did not have a reasonable basis for doubting the veracity of his story because, he says, it was not contradicted by the evidence found at the apartment or the information supplied by the Morenos. He says that the Morenos did not identify him by voice or by sight and that they were not certain whether anyone had left the apartment during the sounds of the beating. The defendant claims that the officers could only have suspected that he was in the

apartment during the beating and did not have probable cause to arrest.

The circuit court found that there was probable cause for the defendant's arrest and a trial court's finding of probable cause will not be set aside on review unless found to be manifestly erroneous. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86; *People v. Clay* (1973), 55 Ill. 2d 501, 5.05.) From our review of the record, we cannot say the trial court's finding was manifestly erroneous.

Probable cause exists where the police have "knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant." (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 60; *Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310-11; *People v. Wright* (1985), 111 Ill. 2d 128, 145.) "Although a 'mere suspicion' that the person arrested has committed the offense is an insufficient basis for arrest [citations], evidence sufficient to convict is not required [citations]." (*People v. Lippert* (1982), 89 Ill. 2d 171, 178-79; *People v. Reynolds* (1983), 94 Ill. 2d 160, 166; *Henry v. United States* (1959), 361 U.S. 98, 101-02, 4 L. Ed. 2d 134, 138, 80 S. Ct. 168, 170-71.) As we recently observed in *People v. Cabrera* (1987), 116 Ill. 2d 474:

> "The courts, in striking a balance between the need to protect citizens from invasions of their privacy at the whim of police officers and the countervailing need to allow leeway for efficient enforcement of the laws, are sensitive to the fact that policemen must often make their decisions to arrest or not to arrest under ambiguous circumstances and must exercise their judgment, at the risk of making a mistake. 'In dealing with probable cause, *** as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians, act.' " 116 Ill. 2d 474, 485, quoting *People v. Moody* (1983), 94 Ill. 2d 1, 7-8.

We judge that the circumstances known to the officers at the time they placed the defendant under arrest and took him to the police station were sufficient to give rise to probable cause to believe that the defendant had committed the offense of obstruction of justice. (See *People v. Toolen* (1983), 116 Ill. App. 3d 632, 650; *People v. Shaw* (1978), 63 Ill. App. 3d 227, 228; *People v. Brooks* (1977), 51 Ill. App. 3d 800, 803.) When the officers questioned the defendant and the three others at the victim's apartment, all denied knowledge of the beating, and by their statements they obviously tried to mislead the officers into believing that the victim had been beaten outside the apartment earlier by some unknown assailant. The evidence gathered by the officers, however, indicated that the fatal beating had taken place in the apartment. The officers found blood and clumps of hair in various places in the apartment. There had been no forced entry, and it would have been reasonable to assume that the assailant was known to the victim. Statements of the downstairs neighbors indicated that there were three or four persons present in the apartment during the beating, and it appeared they were the ones in the apartment when the officers arrived. Considering these circumstances, there was probable cause for the officers to believe that the defendant, Williams, Lloyd and Chapman were acting to mislead the officers in order to protect the assailant.

The defendant contends, too, that the confessions he gave should be suppressed under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, on the ground that they were improperly obtained after he expressed a desire to remain silent. In *Miranda*, the Supreme Court declared that if during custodial interrogation an "individual indicates in any manner, at any

time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *** [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, however, the Supreme Court rejected the argument that *Miranda* established a *per se* proscription on the renewal of questioning by the police following a defendant's initial request to remain silent. The Court held that statements made by a suspect when he had earlier expressed a desire to remain silent are admissible if the police "scrupulously honor" the suspect's "right to cut off questioning." (423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) In *Mosley*, the defendant was arrested for several robberies and at the police station was given *Miranda* warnings, and he declined to discuss the robberies. The police made no effort to question him further until two hours later, when a different detective sought to question the defendant about an unrelated murder. After the defendant had been given the *Miranda* warnings again, he gave an incriminating statement. The Court concluded that the defendant's right to remain silent was scrupulously honored because the police "immediately ceased the [initial] interrogation, resumed questioning only after passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. 96, 106, 46 L. Ed. 2d 313, 322, 96 S. Ct. 321, 327.

The record here shows that the defendant's right to remain silent was "scrupulously honored." The evidence at the suppression hearing was that the defendant, Lloyd, Chapman and Williams were taken to the Aurora

police station at approximately 2 a.m. There Detective Ronald Martin and Sergeant David Strover first questioned Theresa Williams, who told them that it was the defendant who had beaten Simmons at the apartment using his hands, feet and a baseball bat. After taking Williams' statement, Martin and Strover took the defendant from his lockup cell at approximately 6:30 a.m. to a room in the investigations division of the station for questioning. Detective Martin testified that he began to advise the defendant of his rights under *Miranda*, but the defendant interrupted and said: "I know she's dead. I have got nothing to say." Without questioning the defendant, Martin and Strover returned the defendant to the first-floor lockup cell. At 9:30 a.m., Assistant State's Attorney Thomas Sullivan arrived at the Aurora police station, and at his request, Investigators Needham and Tiegelman brought the defendant to an interviewing room. After Sullivan advised the defendant of his *Miranda* rights, he told the defendant that Theresa Williams had given him a statement implicating him in the murder and that they had also spoken to Tony Lloyd. The defendant reacted stating that he understood his *Miranda* rights and proceeded to tell Sullivan, Needham and Tiegelman that he had beaten Simmons to death. After giving this oral statement, the defendant signed a statement in which he waived his rights under *Miranda*, including the right to remain silent, and signed a typed confession.

The defendant argues that his right to remain silent was not "scrupulously honored" because unlike the setting in *Mosley*, he was requestioned about the same crime. We disagree. That a defendant was later questioned regarding the same offense does not of itself mean that his rights under *Miranda* were violated. There have been numerous decisions that this circumstance does not preclude a finding that an accused's

right to remain silent was "scrupulously honored." See *People v. Robinson* (1980), 87 Ill. App. 3d 621, 626; *People v. Fleming* (1981), 103 Ill. App. 3d 194, 196; *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 712; *People v. Colley* (1980), 83 Ill. App. 3d 834, 842; *People v. Connell* (1980), 91 Ill. App. 3d 326, 333; *United States v. Bosby* (11th Cir. 1982), 675 F.2d 1174, 1182; *United States v. Smith* (4th Cir. 1979), 608 F.2d 1011, 1014-15; *Wilson v. Henderson* (2d Cir. 1978), 584 F.2d 1185, 1188-89.

Another contention the defendant makes is that he was denied a fair trial by the trial court's refusal to give his tendered instruction on the lesser-included offense of involuntary manslaughter. The defendant claims that the evidence at trial indicated that his conduct was not intentional but only reckless because he was in an intoxicated and drugged condition at the time of the victim's beating and was acting in a state of extreme jealousy.

When there is evidence in the record which, if believed by the jury, would reduce the crime of murder to manslaughter, an instruction defining the lesser crime should be given. (*People v. Ward* (1984), 101 Ill. 2d 443, 451; *People v. Cannon* (1971), 49 Ill. 2d 162, 165.) An involuntary manslaughter instruction should not be given where the evidence clearly shows that the homicide was murder. *People v. Simpson* (1978), 74 Ill. 2d 497, 501; *People v. Sanders* (1974), 56 Ill. 2d 241, 253.

The basic difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. To sustain a conviction for murder, there must be sufficient evidence by which it is shown that the accused either intended to kill or knew of the strong probability of death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) Involuntary manslaughter is defined as the killing of a human being by

actions which "are likely to cause death or great bodily harm *** and [are] perform[ed] recklessly." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1985, ch. 38, par. 4—6.

The record emphatically rejects the defendant's assertion that his actions were reckless and not intentional. By the defendant's admission he deliberately struck the victim with a baseball bat numerous times on the head and the rest of her body. The pathologist testified that the victim's jaw was completely fractured in two places, the brain was swollen, and that the body, particularly the head, was covered with bruises. The manner in which the defendant used the bat and the severity of the injuries defeat the claim that the defendant was only reckless. (*People v. Ward* (1984), 101 Ill. 2d 443, 452; *People v. Whitt* (1986), 140 Ill. App. 3d 42, 49; *People v. Maxwell* (1985), 130 Ill. App. 3d 212, 216.) A voluntary and willful act which has the natural tendency to cause death or great bodily harm is sufficient evidence of the intent required for the offense of murder. (*People v. Cannon* (1971), 49 Ill. 2d 162, 166; *People v. Latimer* (1966), 35 Ill. 2d 178, 182-83.) Though intoxication may support a finding of recklessness (*People v. Wright* (1986), 111 Ill. 2d 18), the record in no way supports the defendant's claim that he was intoxicated at the time of the beating. The trial court did not err in refusing the tendered instruction.

The defendant next argues that the trial court erred in admitting into evidence two photographs of a child asleep in the apartment where the murder took place.

The defendant correctly contends that the photographs were irrelevant and prejudicial because their admission may have suggested to the jury that it was material to a finding of guilt that the deceased had left a family. Evidence indicating that the victim left a family is improper, as it is without bearing on the guilt or innocence of the accused. (*People v. Neal* (1985), 111 Ill. 2d 180, 197; *People v. Holman* (1984), 103 Ill. 2d 133, 166.) Given, however, the overwhelming evidence of the defendant's guilt, it cannot be said that the admission of the photographs was prejudicial error entitling the defendant to a new trial. This court said in *People v. Carlson* (1982), 92 Ill. 2d 440, that "[e]videntiary errors *** can be labeled harmless *** if properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant." 92 Ill. 2d 440, 449.

The defendant's final argument for the granting of a new trial is that the trial court erred in refusing to order use immunity for John Chapman, whom the defendant called as a witness, after Chapman invoked his fifth amendment privilege to remain silent.

The defendant, however, did not at trial request use immunity for Chapman. Rather, the defendant simply claimed that Chapman's testimony would not be self-incriminating and that the fifth amendment privilege would not be applicable. The defendant raised this issue for the first time in a supplemental brief in this court. By not raising the use immunity question before the trial court, the defendant obviously did not preserve the issue for review by this court. Issues which are raised for the first time here and that were not properly presented to the trial court are deemed waived. (*People v. Neal* (1985), 111 Ill. 2d 180, 196; *People v. Garcia* (1983), 97 Ill. 2d 58, 86.) We would note that in any event the defendant's claim has no merit. This court has repeat-

edly held that the circuit courts have no inherent power to grant immunity, but may only do so pursuant to a motion by the State's Attorney under the statute. (Ill. Rev. Stat. 1985, ch. 38, par. 106—1; *People v. English* (1964), 31 Ill. 2d 301, 308; *People v. Rockola* (1930), 339 Ill. 474, 479-80.) Here, the State's Attorney not only did not move that immunity be granted but specifically opposed it.

Having determined that there was no reversible error during the guilt phase of the trial, we affirm the defendant's conviction for murder.

The defendant also makes contentions of error in his death sentence and the sentencing proceeding. The defendant's first argument is that the trial court violated his right to due process by denying him a full and fair hearing on his motion to avoid the death penalty. Prior to trial, the defendant filed a motion alleging that prosecutors in Kane County were abusing discretion under section 9—1(d) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d)) by arbitrarily asking for the death penalty. The defendant sought to subpoena Robert Morrow, the State's Attorney of Kane County, to present him as a witness and to produce a list of all murder cases prosecuted in his terms of office in which the defendant could have been subject to the death penalty. Too, the State's Attorney had sent a letter to a local newspaper in 1982 criticizing a jury's acquittal of the defendant at that time on a burglary charge. The defendant unsuccessfully argued before the trial court that this was evidence that the State's Attorney was improperly motivated by the acquittal to seek the death penalty here. The trial court rejected the argument, and this court denied a motion to supplement the record with a copy of the letter.

The trial court did not err in quashing the defendant's subpoena and rejecting the defendant's contention

regarding the letter. The defendant did not allege that the State's Attorney was improperly motivated in seeking the death penalty in his case. The basis of the defendant's motion is that the State's Attorney has abused discretion by failing to seek the death penalty in situations where other defendants were liable for the death penalty and the underlying facts were as egregious as the facts in this case. In essence, the defendant sought a case-by-case comparison by the trial court of the facts in his case with the facts in other cases to determine whether the State's Attorney acts consistently in requesting the death penalty where there are similar factual situations. If the State's Attorney was not, the defendant says, he was abusing discretion by arbitrarily selecting those individuals for whom the death penalty was sought.

In *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, this court rejected a constitutional challenge to section 9—1(d) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d)) which claimed that the statute grants the State's Attorney "unbridled discretion" to determine whether or not a capital sentencing hearing shall be held. This court stated that "[a]bsent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." (77 Ill. 2d 531, 541-42, quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 225, 49 L. Ed. 2d 859, 903, 96 S. Ct. 2909, 2949 (White, J., concurring).) In light of this, in *People v. Free* (1986), 112 Ill. 2d 154, the court rejected a defendant's assertion that his death sentence should be vacated on the ground that the State's Attorney was abusing discretion in requesting the death penalty in other instances where there was no evidence that the

State's Attorney was improperly motivated in requesting the death penalty in his case.

In *Free*, the defendant maintained that the prosecutor considered improper factors in deciding to seek the death penalty and that therefore the sentence was imposed in an arbitrary and capricious manner prohibited under *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909. In support of this contention, the defendant compared his sentence with that imposed in *People v. La Pointe* (1981), 88 Ill. 2d 482, where the defendant was liable for the death penalty, but the prosecutor did not seek its imposition. The defendant pointed out that in the State's brief opposing his petition for a writ of *certiorari* to the Supreme Court of the United States, the State explained that the reason it did not seek a death penalty hearing in *La Pointe*'s case was that the prosecutor "may well have reasonably concluded that a jury or judge would not impose the death penalty on a young-looking, eighteen year old defendant [La Pointe] with much stronger evidence of a real drug depending [*sic*] life-style than that involved in the Free case, together with all other circumstances of the case." *People v. Free* (1986), 112 Ill. 2d 154, 161.

In rejecting the defendant's claim this court stated:

"[I]n *Pulley v. Harris* (1984), 465 U.S. 37, 45, 79 L. Ed. 2d 29, 39-40, 104 S. Ct. 871, 879, and in *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958, the Supreme Court specifically rejected the contention that *Gregg* [*v. Georgia* (1976), 428 U.S. 153, 49 L. Ed 2d 859, 96 S. Ct. 2909], upon which the defendant relies, stood for the proposition that a reviewing court should compare the sentence in the appeal before it with the penalties imposed in similar cases upon the defendant's demand. The court was satisfied that the safeguards found in the California and Texas death penalty statutes considered in *Pulley* and *Jurek* made proportionality review 'constitutionally superfluous.' [Cita-

tion.] Our statute, *inter alia*, requires the State to establish that statutory aggravating factors exist, allows the defendant the opportunity to present evidence in mitigation, and provides an automatic review of the death sentence by this court [citation], which are the safeguards which the court in *Pulley* found sufficient, without comparative review, to 'promote the evenhanded, rational, and consistent imposition of death sentences under law.' [Citation.] The conclusion to be drawn is that there need not be a comparative review of the sentence imposed in *La Pointe* and the sentence here.

\* \* \*

Here it is clear that there were statutory aggravating factors: murder committed in the course of a burglary and attempted rape. [Citations.] There is nothing in this record to suggest that the prosecutor's decision to seek the death penalty was based on the defendant's physical appearance or general life-style, or based on the defendant's age beyond the statutory requirement that he have 'attained the age of 18 or more' [citation]. The prosecutor's decision cannot reasonably be attributed to circumstances other than the evidence of the two aggravating factors, and then to the prosecutor's perception of the likelihood that the jury would consider a death sentence appropriate." 112 Ill. 2d 154, 161-63.

As in *Free*, we cannot conclude that the prosecutor's decision to seek the death penalty was based on circumstances other than the presence of a statutory aggravating factor and the likelihood that the sentencing authority would consider imposition of a death sentence. Given the extreme heinousness of the beating and the sexual assault, it cannot be convincingly argued that the prosecutor abused discretion in asking for the death penalty.

Another point of the defendant is that the trial court erred in finding that he was subject to the death penalty on the basis of the existence of the statutory aggravating factor in section 9—1(b)(6) of the Criminal Code (Ill.

Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), namely, that the victim was murdered in the course of an aggravated criminal sexual assault. The defendant maintains that the evidence at trial does not establish that the defendant committed an act of sexual assault "in the course" of the beating that lead to her death. The defendant says the beating was not "causally related" to the sexual assault, the placing of the bat handle in the victim's rectum. The defendant argues that the evidence indicates that the sexual assault was an isolated and incidental part of the beating and, therefore, the evidence was insufficient to make him liable for the death penalty under section 9—1(b)(6).

Section 9—1(b)(6) provides:

> "A defendant *** who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
> 6. the murdered individual was killed in the course of another felony if:
>
>   (a) the murdered individual:
>   (i) was actually killed by the defendant ***
>   *** and
>   (b) in performing the acts which caused the death of the murdered individual *** the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and
>   (c) the other felony was one of the following: *** aggravated criminal sexual assault ***. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).

The record clearly establishes that the defendant killed the victim "in the course" of committing an aggravated criminal sexual assault. The aggravating felony was not an isolated or incidental part of the beating which caused the victim's death. On the contrary, it is undisputed that the defendant severely beat the victim

prior to placing a broken bat handle in her body and that the assault was accomplished through the savage beating the defendant administered. The trial court did not err in finding the defendant was subject to the death penalty under section 9—1(b)(6) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)).

The defendant contends, too, that under the eighth and fourteenth amendments to the Constitution of the United States his being subject to the death penalty can not be predicated on the commission of the sexual assault because the assault provides no meaningful basis on which to distinguish his case from others in which the death penalty was not imposed. The Supreme Court has declared that under the eighth amendment, "[a] capital sentencing scheme must *** provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not' " to prevent the penalty from being administered in an arbitrary and unpredictable fashion. (*Godfrey v. Georgia* (1980), 446 U.S. 420, 427, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764; *Furman v. Georgia* (1972), 408 U.S. 238, 313, 33 L. Ed. 2d 346, 392, 92 S. Ct. 2726, 2764.) This narrowing function is achieved if the death penalty statute "channel[s] the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey v. Georgia* (1980), 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764-65.

We consider that the aggravating factor set out in section 9—1(b)(6) provides a basis for determining those offenders who are subject to capital punishment. An objective standard to guide the sentencer is provided for, as the offense of aggravated criminal sexual assault is clearly defined in section 12—14 of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14). (See also *Peo-*

*ple v. Haywood* (1987), 118 Ill. 2d 263.) Too, there is justification for the State's singling out for the death penalty murders committed in the course of an aggravated criminal sexual assault to deter added acts of violence during the commission of sexual assaults. *People v. Shum* (1987), 117 Ill. 2d 317, 366; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 67-68.

The defendant's next contention is that he is entitled to a new sentencing hearing because the trial court allowed into evidence unreliable testimony of several witnesses in aggravation the State called during the second phase of the sentencing hearing. The defendant maintains that the witnesses' testimony was unreliable, violated his right to confrontation under the sixth amendment to the Constitution of the United States, and resulted in a sentencing hearing that was unfair and unreliable.

Before addressing the defendant's specific objections to the testimony we would observe that section 9—1(e) of our death penalty statute allows the introduction of evidence during the sentencing hearing that would not ordinarily be admissible during the guilt phase of the trial. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e); *People v. Hall* (1986), 114 Ill. 2d 376, 416; *People v. Lyles* (1985), 106 Ill. 2d 373, 414.) This court has stated that a sentencing judge can " '*** exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by the law.' " (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 300.) The only requirement for admission is that the evidence be reliable and relevant (*People v. Perez* (1985), 108 Ill. 2d 70, 88; *People v. Davis* (1983), 95 Ill. 2d 1, 43), as determined by the trial court within its sound discretion. *People v. Lyles* (1985),

108 Ill. 2d 373, 414; *People v. Free* (1983), 94 Ill. 2d 378, 423-24.

The defendant's first complaint is of the hearsay testimony of John Richmond and Gregory Dickinson. Officer John Richmond of the Aurora police department testified that in September of 1975 Doris Bryan stated that on the previous evening the defendant and three other men tied her up with an electric cord and beat her with a wooden stick. Richmond said that Bryan told him that the defendant dropped on her face with his knee, loosening several of her teeth. There was no prosecution of the defendant.

Gregory Dickinson, an investigator in the Kane County sheriff's office, testified that he investigated an armed robbery of a tavern which occurred on November 21, 1975, and which involved the defendant, Melvin Ford, Robert Merriweather and Virgil Boatee. Dickinson further testified that he interviewed Ford and Merriweather after their arrest and that each gave statements implicating the defendant in the robbery. With respect to Ford, Dickinson testified:

> "Mr. Ford stated to us that he had been brought into this armed robbery because he had borrowed Mr. Foster's motor vehicle and had an accident with it, and thusly, Mr. Foster had told him that he could work off the debt by accompanying him on this armed robbery."

In reference to his interview with Merriweather, Dickinson stated:

> "During the armed robbery, Mr. Foster had made statements that he was going to kill the bartender, and it was only because of Mr. Merriweather's actions that stopped Mr. Foster from killing the bartender.
>
> And on their—this was at the departure point at leaving the tavern and walking out the door, Mr. Foster instructed Mr. Merriweather to shoot several times back into the tavern, at which Merriweather did do that, he

did shoot back into the tavern *** to scare the people to keep them down so they wouldn't come out."

The defendant was convicted of robbery.

The defendant says the hearsay testimony violated his right to confrontation because there was no showing of the declarant's unavailability and no guarantee of reliability. It has been made clear that hearsay testimony is not *per se* inadmissible at a sentencing hearing as unreliable or as denying a defendant's right to confront accusers. The objection goes to the weight and not admissibility. (*People v. Hall* (1986), 114 Ill. 2d 376, 417; *People v. Perez* (1985), 108 Ill. 2d 70, 86; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365.) Too, this court observed in *People v. Jones* (1982), 94 Ill. 2d 275, 286-87, that "a defendant in a capital case has no due process right to cross-examine all out-of-court sources of information relied upon in sentencing." (See also *Williams v. New York* (1949), 337 U.S. 241, 250-51, 93 L. Ed. 1337, 1343-44, 69 S. Ct. 1079, 1085; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365.) This court has recognized, however, that where this court has approved the admission of double hearsay, at least some parts of the double hearsay have been corroborated by other evidence. See *People v. Erickson* (1987), 117 Ill. 2d 271, 300; *People v. Perez* (1985), 108 Ill. 2d 70, 86-87.

The trial court did not abuse discretion in admitting the testimony of Investigator Dickinson. It was relevant to show the defendant's prior criminal behavior and was clearly reliable. It was corroborated by the evidence of the State that the defendant was convicted for the robbery and by the testimony of two witnesses who were present at the armed robbery who stated that as the robbers left, one of them fired several shots back into the tavern. The testimony of Richmond concerning the assault on Doris Bryan, on the other hand, lacks corroboration. Nevertheless, under our holdings the testimony

is not inherently unreliable (*People v. Whitehead* (1987), 116 Ill. 2d 425, 454), and in view of the fact that the officer compiled the information during an official investigation (*People v. Morgan* (1986), 112 Ill. 2d 111, 144), and that the evidence was never directly challenged (*People v. Hall* (1986), 114 Ill. 2d 376, 417; *People v. Johnson* (1986), 114 Ill. 2d 170, 206), the trial court did not abuse discretion in finding the evidence reliable. Furthermore, we observe that the trial court, in stating its findings, made clear that it was not relying on the witnesses' testimony in making its decision. The court stated:

> "[E]ven if the court disregards all of the testimony other than the certified copies of convictions, I don't think that there is any question—and I am not saying that I am totally disregarding all of the testimony in aggravation \*\*\* that the defendant does have a significant history of prior criminal activity."

We would add that even if it were to be held that the admission of the testimony regarding Bryan was an abuse of discretion, the error was not, considering all of the evidence, reversible.

The defendant also contends that the trial court erred in denying his motion to compel two witnesses who testified at the sentencing hearing to execute releases and permit the defendant access to their medical records. The defendant claims that the witnesses admitted mental disturbances which bore on their credibility and that permitting the witnesses to testify without granting the motion violated his sixth amendment right to confrontation.

At the sentencing hearing, Glen Carson testified that he was involved in an armed robbery of the tavern on November 21, 1975, by the defendant, Melvin Ford, Robert Merriweather, and Virgil Boatee. Carson, who was a customer, stated that the defendant entered the

tavern with a sawed-off shotgun, and along with the other three men, took money from the cash register and stripped several of the customers of their valuables. Carson also testified that one of the men carried a pistol and after leaving the tavern, fired several shots back into the tavern. In addition, Carson stated that after the incident, and he feels because of it, he sought treatment at the Long Beach Hospital for alcoholism and a "nervous" disorder.

Stephen Wagner testified that while he was incarcerated in the Kane County jail in October of 1976, the defendant, along with two other men, struck him and forced him to perform acts of oral sex and submit to anal sex. Wagner also stated that before the incident he had been hospitalized at the Elgin mental health center for psychiatric treatment and that after the incident he returned to the hospital for four months.

We consider that the trial court did not err in refusing to compel Carson to execute a release for his medical records. Carson's testimony was relevant and also reliable, as there was ample corroboration of his testimony (the record of conviction and the testimony of other witnesses). Given the fact that the testimony is reliable and relevant, and that the defendant was given the opportunity to cross-examine the witness as to the robbery as well as his mental health, we consider that the trial court did not abuse discretion in allowing the testimony.

We consider that Wagner's testimony, however, lacked sufficient corroboration to be considered reliable. Nevertheless, we do not judge that thereby the defendant was denied a fair sentencing hearing, because it was not inherently unreliable (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 454), and, too, the trial judge stated that the evidence of convictions alone showed that the defendant had "a significant history of prior criminal activity." The

court's refusal to grant the defendant's motion to compel both witnesses to permit access to their mental health records was not, as the defendant claims, significant error.

The defendant's next contention is that the trial court erred in refusing to require the prosecution to disclose its notes on the interviews it conducted with witnesses testifying in aggravation. Approximately three weeks prior to trial, the defendant filed a motion for discovery of the names and addresses of the witnesses the prosecution intended to call at the death penalty hearing. The court granted the motion, and the prosecutors provided the defendant with a list of 28 persons they intended to call in aggravation. The defendant's motion for disclosure of the prosecutor's notes of the interviews with the witnesses was denied, the court stating that disclosure of the notes was "not necessary in the sentencing portion of the trial."

The defendant claims that our Rule 412(a) required the State to disclose the notes, while the State says that the provisions in Rule 412 are not applicable to sentencing hearings, but only to criminal trials.

We consider that holdings of the appellate court that the discovery provisions are not applicable to sentencing proceedings are correct. (See *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 789; *People v. Siefke* (1981), 97 Ill. App. 3d 14, 16.) In *People v. DeWitt* (1979), 78 Ill. 2d 82, this court observed that an accused is not, in general, constitutionally entitled to discovery (see *Weatherford v. Bursey* (1977), 429 U.S. 545, 51 L. Ed. 2d 30, 97 S. Ct. 837; *Wardius v. Oregon* (1973), 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208; *Williams v. Florida* (1970), 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893), and that a probationer, already convicted of a crime, is entitled to fewer procedural safeguards than one who has not been convicted at all (see *Gagnon v. Scarpelli*

(1973), 411 U.S. 778, 789 n.12, 36 L. Ed. 2d 656, 665 n.12, 93 S. Ct. 1756, 1763 n.12). This court in *DeWitt* concluded that due process does not require discovery at a probation-revocation proceeding and that our Rule 411 did not entitle an accused to discovery at a probation-revocation proceeding. Rule 411 provides that the criminal discovery rules apply in the context of criminal cases "wherein the accused is charged with an offense for which, upon conviction, he might be imprisoned in the penitentiary." (107 Ill. 2d R. 411.) In rejecting the defendant's reliance on Rule 411, the court stated:

> "While our discovery rules do not specifically exclude probation- or parole-revocation hearings, it is quite clear that they were designed for use in connection with criminal trials. Those rules apply to the probationer's trial on the underlying offense, but a petition to revoke probation is not a criminal indictment or information and a judgment revoking probation is not a felony conviction." *People v. Dewitt* (1979), 78 Ill. 2d 82, 86.

Similarly, a defendant at the sentencing stage of a felony prosecution has already been convicted and, therefore, is "entitled to fewer procedural safeguards than one who has not been convicted at all." (*People v. DeWitt* (1979), 78 Ill. 2d 82, 85; *Gagnon v. Scarpelli* (1973), 411 U.S. 778, 789, 36 L. Ed. 2d 656, 665-66, 93 S. Ct. 1756, 1763.) Indeed, it has repeatedly been held that the admissibility of evidence at the aggravation and mitigation phases of a sentencing hearing is not governed by the restrictive rules of evidence in effect at the guilt stage of the trial. (*Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083; *People v. Free* (1983), 94 Ill. 2d 378, 426.) As stated, discovery is not constitutionally required. We consider that the defendant's request to change our discovery rules to include sentencing hearings is unnecessary

in light of the present safeguards afforded a defendant in sentencing hearings.

The defendant contends that the trial court abused discretion in imposing the death sentence because it is a disproportionate and excessive penalty. He states that there are mitigating factors which should preclude imposition of the death penalty. Specifically, he argues that he was under the influence of an extreme mental or emotional disturbance at the time of the offense and that he has no significant history of criminal activity.

The trial court findings that the defendant was not suffering from an extreme mental or emotional disturbance at the time of the offense and that he has a significant history of prior criminal activity are clearly supported from the record. (*People v. Brownell* (1980), 79 Ill. 2d 508, 540; *People v. Myers* (1966), 35 Ill. 2d 311, 340-41.) The imposition of the death penalty here is commensurate with the gravity of the offense and the character of the defendant. *People v. Sanchez* (1986), 115 Ill. 2d 238, 274; *People v. Free* (1983), 94 Ill. 2d 378, 428-29; *People v. Carlson* (1980), 79 Ill. 2d 564, 587.

As we have shown from the record, the victim was brutally and in cold blood beaten with a baseball bat and repulsively and deliberately abused. The defendant had a significant criminal history which began when he was adjudicated a delinquent for burglary and graduated to adult convictions for robbery, theft, and unlawful possession of a firearm. The evidence in mitigation indicated that he supported to some extent the two children born to him and Earline Taylor, and, curiously, he was said to be religious. Though these factors pleaded in mitigation are relevant in the sentencing determination, on this record they certainly do not preclude imposition of the death penalty. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 275; *People v. Brownell* (1980), 79 Ill. 2d 508, 538.) Given the record of extreme aggravation and the scant

evidence in mitigation, the trial court did not abuse discretion in imposing a sentence of death. *People v. Cox* (1980), 82 Ill. 2d 268, 281; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153.

The defendant also raises a number of challenges to the constitutionality of the our death penalty statute. He says that the statute is unconstitutional because under our decisions the sentencer is not to consider sympathy as a mitigating factor. This constitutional issue was considered and resolved against the defendant by the Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. There, the Court held that an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial does not violate the eighth and fourteenth amendments to the Constitution of the United States. Our decisions are in accord. See *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445.

He presents a number of other constitutional challenges to the statute, which have been rejected. Although the defendant acknowledges that this court has rejected these contentions, he argues that we should reconsider its holdings, but offers no new arguments. We consider that there is no necessity or fresh reason to reexamine these decisions.

These holdings include decisions that the statute is not constitutionally infirm because it fails to provide a procedure whereby a sentence of death is reviewed to ascertain whether or not it is proportional to the penalty given in resembling situations. (*People v. Walker* (1985), 109 Ill. 2d 484, 508; *People v. Silagy* (1984), 101 Ill. 2d 147, 161, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) This argument has also been considered and rejected by the Supreme Court. (*Pulley v.*

*Harris* (1984), 465 U.S. 37, 44-51, 79 L. Ed. 2d 29, 36-41, 104 S. Ct. 871, 876-80.) This court has also rejected claims of unconstitutionality on the ground that the statute provides inadequate pretrial notice of aggravating evidence (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41; *People v. Davis* (1983), 95 Ill. 2d 1); that the sentencing body is not required to provide a written statement of its findings (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41; *People v. Gaines* (1981), 88 Ill. 2d 342, 383-84); that the sentencer is not required to make a specific finding after weighing aggravating and mitigating factors that a death sentence will be appropriate punishment (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46; *People v. Walker* (1985), 109 Ill. 2d 484, 508-09); that the statute is unconstitutional because it is claimed that the structure of the death penalty act places the burden of proof on the defendant (*People v. Sanchez* (1986), 115 Ill. 2d 238, 268-69; *People v. Williams* (1983), 97 Ill. 2d 252, 265); and that the statute is unconstitutional because it improperly exempts from the death penalty those who require special assistance to stand trial (*People v. Johnson* (1986), 114 Ill. 2d 170, 208; *People v. Perez* (1985), 108 Ill. 2d 70, 94-95; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502).

For the reasons given, the judgment of the circuit court of Kane County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 17, 1988, as the date on which the sentence of death in the circuit court is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center and to

the warden of the institution where the defendant is confined.

*Judgment affirmed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.

JUSTICE SIMON, dissenting:

I disagree with the majority's conclusion that statements given by the defendant in response to interrogation after he had invoked his right to remain silent were properly admitted. His incriminatory statements should have been suppressed as the product of an illegal interrogation initiated after the defendant had asserted his fifth amendment right.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court established the procedure to be followed once a suspect in custody invokes his right to silence under the fifth amendment:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.

This passage from *Miranda* and the procedure to be followed was further defined in *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321. Under *Miranda* the admissibility of any statements ob-

tained after the suspect invokes his right to remain silent depends on whether the person's " 'right to cut off questioning' was 'scrupulously honored.' " (423 U.S. at 104, 46 L. Ed. 2d at 321, 96 S. Ct. at 326.) The Court in *Mosley* determined that the defendant's right to cut off questioning was scrupulously honored where "the police *** immediately ceased the [initial] interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and *restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.*" (Emphasis added.) 423 U.S. at 106, 46 L. Ed. 2d at 322, 96 S. Ct. at 327.

The Court assigned considerable weight to the fact that the second interrogation in *Mosley* concerned a separate and unrelated offense. (*Wentela v. State* (1980), 95 Wis. 2d 283, 297-98, 290 N.W.2d 312, 319.) This factor "seems critical, for in its absence one is left only with a renewed effort to question by a different member of the same police force, in a different room in the same building, only two hours after Mosley's assertion of his right not to be questioned." (Stone, *The Miranda Doctrine in the Burger Court*, 1977 Sup. Ct. Rev. 99, 134.) In essence, Mosley exercised his right to remain silent about the first crime, the robberies, and that right was respected. He did not invoke his right to remain silent about the murder, which was entirely unrelated to the robberies, and therefore the subsequent interrogation about the murder did not violate his fifth amendment rights.

Recognizing the importance of this factor, in applying *Mosley* both Federal and State courts have held that once a suspect invokes his fifth amendment right in response to questioning about a crime, subsequent interrogation about that same crime violates the suspect's constitutional rights. See, *e.g.*, *United States v. Olof* (9th

Cir. 1975), 527 F.2d 752, 754; *United States v. Clayton* (E.D. Wis. 1976), 407 F. Supp. 204, 207; *Commonwealth v. Taylor* (1978), 374 Mass. 426, 435, 374 N.E.2d 81, 86; *Commonwealth v. Walker* (1977), 470 Pa. 534, 545, 368 A.2d 1284, 1289-90. See also *United States v. Hernandez* (5th Cir. 1978), 574 F.2d 1362, 1369; *Shaffer v. Clusen* (E.D. Wis. 1981), 518 F. Supp. 963, 965; *United States v. Jakakas* (E.D.N.Y. 1976), 423 F. Supp. 564, 569.

The facts in this case differ significantly from those in *Mosley* on the critical issue of reinterrogation about the same crime. When Detective Martin and Sergeant Strover began to question the defendant about Simmons' death, he invoked his right to remain silent. Only three hours later, after consulting with Martin and Strover and learning that the defendant had invoked his fifth amendment right, an assistant State's Attorney requestioned him about Simmons' murder, the same crime for which he had already asserted his right to remain silent. Far from being "scrupulously honored," his right to cut off questioning about Simmons' death was blatantly ignored, and the resulting statements were therefore inadmissible. The trial court's refusal to suppress these statements was a serious error requiring reversal of the conviction and a new trial.

The majority also erred in holding that the discovery provisions in Supreme Court Rule 412(a) (107 Ill. 2d R. 412(a)) are not applicable to sentencing proceedings. In *People v. Williams* (1983), 97 Ill. 2d 252, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364, this court applied our Rule 412(c) to a sentencing hearing. We based our decision upholding the State's presentation of both opening and closing arguments in the sentencing hearing on the fact that under Rule 412(c) the State has an affirmative duty to disclose to defendant's counsel mitigating evidence of which it has knowledge and it therefore has the burden of going forward with

the evidence in a sentencing proceeding. (97 Ill. 2d at 302.) Having decided that Rule 412(c) applies to sentencing proceedings, there is no justification for holding that the other provisions of Rule 412 are not applicable.

The majority cites *People v. DeWitt* (1979), 78 Ill. 2d 82, in support of its assertion that the discovery provisions of our rules are not applicable to sentencing proceedings. In that case the court held that our Rule 411 does not entitle an accused to discovery at a probation revocation hearing. (78 Ill. 2d at 86.) The rule announced in *DeWitt* was that in the absence of a constitutional requirement, the decision whether to allow discovery at a hearing should be made by comparing the interest of the defendant with the interest of the State. (78 Ill. 2d at 87.) The State's interest in incarcerating a probationer who committed another crime outweighed the defendant's interest in conditional liberty. (78 Ill. 2d at 87.) In the instant case, however, the defendant's fundamental interest in preserving his life obviously outweighs the State's interest in expediting the sentencing hearing.

The facts surrounding the defendant's request for discovery further demonstrate the necessity of applying Rule 412(a) to sentencing proceedings. On May 14, 1985, approximately three weeks prior to trial, the defendant filed a motion for discovery of the names and addresses of witnesses the prosecution intended to call at the death penalty hearing. The trial court granted the motion on May 23, over the State's objection. The State did not comply until June 10, one day before the sentencing hearing began. At that time the prosecutors tendered a list of 28 persons they intended to call in aggravation at the penalty hearing. Defense counsel attempted to contact and interview as many of the 28 witnesses as he could overnight. The next day in court, out of necessity, defense counsel moved for disclosure of the prosecutors' notes of interviews with the witnesses to aid him in

cross-examining them. The trial court refused this request.

The statute governing death penalty hearings requires that each side have a "fair opportunity to rebut any information received at the hearing." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(e).) The prosecutors' notes of prior statements by the witnesses were a valuable tool for cross-examination, particularly in view of the delay in providing a list of witnesses to the defendant. (See *Jencks v. United States* (1957), 353 U.S. 657, 667, 1 L. Ed. 2d 1103, 1111, 77 S. Ct. 1007, 1013.) Refusing to allow defense counsel access to those notes deprived defendant of a fair opportunity to rebut the witnesses' testimony in violation of the statute governing the procedures to be followed at death penalty hearings (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(e)). Given our prior application of Rule 412(c) to sentencing hearings, the defendant's fundamental interest in preserving his life and the requirement that both parties at a death penalty hearing have a fair opportunity to rebut any evidence presented at the hearing, a defendant should be entitled to use the discovery provisions of Rule 412(a) at a sentencing hearing.

Because of these significant errors at both the trial and the sentencing hearing, I would remand this case for a new trial.